BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
THOMAS J. O'REARDON II (247952)
701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com

CARLSON LYNCH SWEET KILPELA
    & CARPENTER, LLP
TODD D. CARPENTER (234464)
1350 Columbia Street, Suite 603
San Diego, CA  92101
Tel: 619/762-1910
619/756-6991 (fax)
tcarpenter@carlsonlynch.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| GORDON NOBORU YAMAGATA and STAMATIS F. PELARDIS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>RECKITT BENCKISER LLC,<br><br>        Defendant. | Case No. 3:17-cv-03529-VC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>District Judge Vince Chhabria<br>Courtroom 4, 17th Floor<br><br>Complaint Filed:    June 19, 2017<br>Trial Date:        Not Yet Set<br><br>**JURY TRIAL DEMANDED** |

BLOOD HURST & O'REARDON, LLP

00124768

BLOOD HURST & O'REARDON, LLP

1   Plaintiffs Gordon Noboru Yamagata and Stamatis F. Pelardis ("Plaintiffs") bring this

2   class action complaint against Defendant Reckitt Benckiser LLC ("Defendant"), individually

3   and on behalf of all others similarly situated, and allege upon personal knowledge as to

4   Plaintiffs' acts and experiences, and, as to all other matters, upon information and belief,

5   including investigation conducted by Plaintiffs' attorneys.

6   **<u>NATURE OF THE ACTION</u>**

7   1.   This is a consumer protection class action arising out of Defendant's false and

8   misleading advertising of its glucosamine Move Free Products.

9   2.   Defendant markets, sells and distributes a line of joint health dietary

10   supplements under the "Schiff Move Free" brand name, and Defendant represents that these

11   Move Free Products provide meaningful benefits to the joints of all consumers who use them.

12   3.   All of the Move Free Products in Defendant's joint health product line, through

13   its labeling and packaging, and through Defendant's other advertising and marketing materials,

14   communicate the same substantive message to consumers: that the Move Free Products

15   provide meaningful joint health benefits.

16   4.   These representations are designed to induce consumers to believe that

17   Defendant's "Move Free" joint health Move Free Products are capable of actually providing

18   meaningful benefits, and consumers purchase Defendant's Move Free joint health products

19   solely for the purpose of enjoying these purported joint health benefits.

20   5.   Defendant's Move Free Products, however, are incapable of supporting or

21   benefiting the health of human joints because the main ingredients in each of Defendant's joint

22   health Move Free Products, either alone or in combination with other ingredients, cannot

23   support or benefit joint health. Accordingly, Defendant's joint health representations are false,

24   misleading and deceptive, and its joint health Move Free Products are worthless.

25   6.   Plaintiffs bring this action individually and on behalf of all other similarly

26   situated consumers to halt the dissemination of Defendant's false and misleading

27   representations, correct the false and misleading perception Defendant's representations have

28   created in the minds of consumers, and to obtain redress for those who have purchased any of

Defendant's Move Free Products at issue.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

7.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant.

8.     This Court has personal jurisdiction over Defendant because Defendant conducts business in California. Defendant has marketed, promoted, distributed, and sold the Move Free Products at issue in California, rendering exercise of jurisdiction by California courts permissible.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this district.

10.     Assignment is proper to the San Francisco Division of the Northern District of California under Civil L.R. 3-2(c) and (d) because a substantial part of the events or omissions that gave rise to Plaintiffs' claim occurred in Alameda County.

## PARTIES

11.     Plaintiff Gordon Noboru Yamagata is a 67 year-old citizen of the State of California, and, at all times relevant to this action, resided in Alameda County, California.

12.     On March 22, 2017, Plaintiff Yamagata saw Defendant's Schiff Move Free Advanced Triple Strength product at a Target retail store located at 1555 4th Avenue, Emeryville, California 94608.

13.     Relying on the product's joint health representations, Plaintiff Yamagata purchased the product for approximately $20.99. By purchasing the falsely advertised product, Plaintiff suffered injury-in-fact and lost money.

14.     Plaintiff Stamatis F. Pelardis is a citizen of the State of New York, and, at all times relevant to this action, resided in New York City, New York.

BLOOD HURST & O'REARDON, LLP

00124768

15. On March 17, 2017, Plaintiff Pelardis saw Defendant's Schiff Move Free Advanced Plus MSM product at a Walgreens retail store located at 931 1st Avenue, New York, New York 10022.

16. Relying on the product's joint health representations, Plaintiff Pelardis purchased the product for approximately $29.99. By purchasing the falsely advertised product, Plaintiff suffered injury-in-fact and lost money.

17. The Move Free Products Plaintiffs purchased, like all of Defendant's Move Free Products, cannot provide the advertised benefits. Had Plaintiffs known the truth about Defendant's misrepresentations and omissions at the time of purchase, Plaintiffs would not have purchased Defendant's Move Free Products.

18. Reckitt Benckiser LLC is a Delaware corporation with its principal place of business located in Parsippany, New Jersey.

19. Defendant manufactures, advertises, markets, distributes, and/or sells Move Free Products at issue to tens of thousands of consumers in California and New York, and throughout the United States.

## FACTUAL ALLEGATIONS

### I. *Defendant's Glucosamine and Chondroitin Move Free Products*

20. Defendant sells glucosamine and chondroitin Move Free Products through its own retail websites, www.movefree.com and wwww.schiffvitamins.com, and through various retail stores, like Target, Costco, Walmart, Sam's Club and Walgreens.

21. Defendant's glucosamine and chondroitin Move Free Products are each sold under the "Schiff Move Free" brand name (collectively the "Move Free Products"):

- Schiff Move Free Advanced Triple Strength

- Schiff Move Free Advanced Plus MSM

- Schiff Move Free Advanced Plus MSM & Vitamin D

- Schiff Move Free Double Strength

22. The main ingredients of each Move Free Product are glucosamine hydrochloride and chondroitin sulfate.

BLOOD HURST & O'REARDON, LLP

3

Case No. 3:17-cv-03529-VC

FIRST AMENDED CLASS ACTION COMPLAINT

23. Glucosamine hydrochloride is a combination of glucosamine (an amino sugar that is produced by the body and that can be isolated from shellfish) and hydrochloric acid.

24. Chondroitin is a component of human connective tissues found in cartilage and bone. In supplements, chondroitin sulfate usually comes from animal cartilage.

25. Sometimes called degenerative joint disease or degenerative arthritis, osteoarthritis is the most common chronic condition of the joints, affecting approximately 27 million Americans. Osteoarthritis can affect any joint, but it occurs most often in knees, hips, hands, and spine. According to the Arthritis Foundation, one in two adults will develop symptoms of osteoarthritis symptoms during their lives, and one in four adults will develop symptoms of hip osteoarthritis.

26. According to the Mayo Clinic, the signs and symptoms of osteoarthritis include joint pain, joint tenderness, joint stiffness, and the inability to move joints through full range of motion.[1]

**II.     *Defendant's False and Deceptive Advertising***

27. Defendant, through its advertisements, including on the Move Free Move Free Products' packaging and labeling, has consistently conveyed to consumers throughout the United States that the Move Free Products support and promote joint health.

28. For instance, each of the Advanced Move Free Products are labelled as "Joint Health" supplements, and the label of each Advanced Move Free Product states "Flexibility, Comfort, Lubrication" and contains a picture of a runner with his knee joint highlighted. Likewise, the label of the Move Free Double Strength Product states "Joint Strengthener," "Cushion, lubricate and nourish your joints" and contains a picture of a human body with its knee, hip, and arm joints highlighted.

29. Because it attracts purchasers who suffer from arthritis and joint pain, the Move Free Product labeling also prominently includes the Arthritis Foundation logo. To reinforce the message, the Move Free Product label also states Schiff is a "PROUD SPONSOR of the

---

[1] http://www.mayoclinic.com/health/osteoarthritis/DS00019/DSECTION=symptoms (last visited March 15, 2013).

BLOOD HURST & O'REARDON, LLP

ARTHRITIS FOUNDATION" and "Schiff®, the maker of Move Free®, is proud to support the Arthritis Foundation's efforts to help people take control of Arthritis. For information about arthritis, contact the Foundation at 800-568-4045 or www.arthritis.org".

30.     On the Move Free Product labeling, Defendant also uses the advertising slogan "MOVE BETTER, FEEL BETTER® WITH **MOVE FREE**®." For the Move Free Advanced Products, Defendant states "GLUCOSAMINE: Helps by strengthening, protecting and rebuilding joints" and "CHONDROITIN: Assists in lubricating and cushioning joints." For the Move Free Double Strength Product, Defendant states "Glucosamine: is a basic building block of joint cartilage, which helps to maintain structural integrity of joints and connective tissues" and "Chondroitin is a naturally occurring nutrient found in connective tissue. It is capable of binding water molecules to lubricate, cushion and support joints."

31.     Defendant furthers these joint health representations on its Move Free Products' websites (www.movefree.com and www.schiffvitamins.com), including by stating that each of the Move Free Products "Supports Joint Health" and "Comforts Joints."

32.     Prior versions of Defendant's Move Free Products also were labelled as "Joint Health" supplements.

33.     The front labels of these past Move Free Product versions, similar to Defendant's current Move Free Product versions, contained a picture of a runner and stated, "supports 5 signs of joint health: mobility, comfort, strength, flexibility, lubrication."

34.     Based on the current and former representations contained on Defendant's Move Free Products and on its websites, it is clear that the Move Free Products are intended to induce a common belief in consumers that the Move Free Products are capable of providing meaningful joint health benefits for all those who consume them.

**III.**     ***Scientific Studies Confirm That the Move Free Products Are Not Effective and Defendant's Joint Health Representations Are False, Deceptive and Misleading***

35.     Despite Defendant's representations, glucosamine, alone or in combination with other ingredients, including chondroitin, is *not* effective at supporting or benefiting joint health.

**Randomized Clinical Trials**

36.     Randomized clinical trials ("RCTs") are "the gold standard for determining the relationship of an agent to a health outcome." Federal Judicial Center, *Reference Manual on Scientific Evidence*, 555 (3d ed. 2011). "Double-blinded" RCTs, where neither the trial participants nor the researchers know which participants received the active ingredient is considered the optimal strategy.

37.     Glucosamine and chondroitin have been extensively studied in RCTs, and the well-conducted RCTs demonstrate that glucosamine and chondroitin, alone or in combination, are not effective at producing joint health benefits.

38.     The leading series of studies testing glucosamine and chondroitin are known as the "GAIT" studies. The GAIT studies were independently conducted, and funded by the National Institutes of Health. The primary GAIT study cost over $12.5 million.

39.     In 2006, results from the primary GAIT study – a 1,583-patient, 24-month, multi-center RCT – were published in the New England Journal of Medicine (the "2006 GAIT Study"). Authors of the 2006 GAIT Study concluded: "[t]he analysis of the primary outcome measure did not show that either [glucosamine or chondroitin], alone or in combination, was efficacious …." Clegg, D., *et al.*, *Glucosamine, Chondroitin Sulfate, and the Two in Combination for Painful Knee Osteoarthritis*, 354 New England J. of Med. 795, 806 (2006).

40.     In 2008, additional GAIT study findings were published. *See* Sawitzke, A.D., *et al.*, *The Effect of Glucosamine and/or Chondroitin Sulfate on the Progression of Knee Osteoarthritis: A GAIT Report*, 58(10) J. Arthritis Rheum. 3183–91 (Oct. 2008). The 2008 GAIT publication explored the effects of glucosamine and chondroitin on progressive loss of joint space width. The researchers found "no significant differences in mean [joint space width] loss over 2 years between the treatment groups and the placebo group …." In other words, glucosamine and chondroitin, alone or in combination do not work and do not impact joint space width loss or otherwise rebuild cartilage.

41.     In 2010, the NIH released a third set of results from the GAIT studies. *See* Sawitzke, A.D., *Clinical Efficacy And Safety Of Glucosamine, Chondroitin Sulphate, Their*

BLOOD HURST & O'REARDON, LLP

00124768

BLOOD HURST & O'REARDON, LLP

*Combination, Celecoxib Or Placebo Taken To Treat Osteoarthritis Of The Knee: 2-Year Results From GAIT*, 69(8) Ann Rhem. Dis. 1459-64 (Aug. 2010). Authors of the 2010 GAIT report concluded that glucosamine and chondroitin do not provide pain, function, stiffness or mobility benefits. The authors also determined glucosamine and chondroitin do not benefit those with moderate-to-severe knee pain – a *post-hac*, secondary analysis which the original GAIT publication found inconclusive.

42.     In addition to GAIT, four other RCTs have examined a combination of glucosamine hydrochloride and chondroitin sulfate versus placebo. Each of these studies found glucosamine and chondroitin do not work.

43.     In 2007, Messier *et al.*, published results from their 12-month, double-blind RCT examining 89 subjects in the United States. Messier SP *et al.*, *Glucosamine/chondroitin combined with exercise for the treatment of knee osteoarthritis: a preliminary study*. Osteoarthritis and Cartilage, 15:1256-1266 (2007). Messier and co-authors concluded that daily consumption of a combination of glucosamine hydrochloride and chondroitin sulfate (the same ingredients in the Move Free Products) does not provide joint pain, function, stiffness or mobility benefits.

44.     Fransen *et al.* (2014) examined 605 subjects over a 2-year period. Fransen M *et al.*, *Glucosamine and chondroitin for knee osteoarthritis: a double-blind randomized placebo-controlled clinical trial evaluating single and combination regimens*, Ann Rheum Disease 74(5):851-858 (2014). Fransen concluded that glucosamine and chondroitin, alone or in combination, are no better than placebo for reducing pain or improving physical function:

> For the main symptomatic outcome … no significant effect on maximum knee pain over year 1 … was demonstrated for the three treatment allocations, compared with placebo. Over year 2 … there were no differences between the four allocations … and there was no significant difference in knee pain reduction between any of the treatment groups and placebo after adjusting for baseline values. Among the subgroup of 221 (37%) participants with severe knee pain … at baseline, there were no significant differences with respect to their maximum knee pain or global assessment and score across different treatment groups.

FIRST AMENDED CLASS ACTION COMPLAINT

00124768

*Id.* at 3-4; *see also id.* at 5-6 ("there were no significant reductions in knee pain detected for glucosamine or chondroitin alone, or in combination, over the 2-year follow-up period versus placebo") and *id.* at 4 ("[t]here were no significant differences" for any secondary measures, including WOMAC pain or function).

45.     Yang *et al.* (2015) analyzed 1,625 participants to estimate the effectiveness of the combination of glucosamine and chondroitin in relieving knee symptoms and slowing disease progression among patients with knee osteoarthritis. Yang, *et al.*, entitled *Effects of glucosamine and chondroitin on treating knee osteoarthritis: an analysis with marginal structural models*, Arthritis & Rheumatology, Vol. 63, No. 3, 714-23 (March 2015). The researchers found that glucosamine and chondroitin combinations provided no clinically significant benefits in terms of reducing pain or stiffness, improving physical function or mobility, or delay the progression of joint space narrowing or osteoarthritis.

46.     A 2016 randomized, double-blind, placebo-controlled clinical trial by Roman-Blas, *et al.*, entitled *Combined Treatment With Chondroitin Sulfate and Glucosamine Sulfate Shows No Superiority Over Placebo for Reduction of Joint Pain and Functional Impairment in Patients With Knee Osteoarthritis*, Arthritis & Rheumatology, Vol 69, No. 1, 77-85 (Jan. 2017), concluded that a combination of glucosamine and chondroitin was not superior to a placebo pill in terms of reducing joint pain and functional impairment in patients with symptomatic knee osteoarthritis over a six month period.

47.     In 2016, Lugo *et al.* also published the results from a study comparing a combination of glucosamine and chondroitin versus placebo. Lugo JP *et al.*, *Efficacy and tolerability of an undenatured type II collagen supplement in modulating knee osteoarthritis symptoms: a multicenter randomized, double-blind, placebo-controlled study*, Nutrition Journal (2016). Lugo was a multicenter, double-blind RCT examining 190 subjects over 180 days. Lugo and co-authors found that a combination of glucosamine hydrochloride and chondroitin sulfate (the same ingredient combination in the Move Free Products) was no better than placebo in terms of joint pain, stiffness, mobility or physical function.

BLOOD HURST & O'REARDON, LLP

00124768

48.    The results from GAIT and these other clinical studies testing glucosamine and chondroitin combinations versus placebo, are also consistent with the reported results of prior and subsequent studies.

49.    For example, a 1999 study involving 100 subjects by Houpt *et al.*, entitled *Effect of glucosamine hydrochloride in the treatment of pain of osteoarthritis of the knee*, 26(11) J. Rheumatol. 2423-30 (1999), found that glucosamine hydrochloride performed no better than placebo at reducing pain at the conclusion of the eight week trial.

50.    Likewise, a 2004 study by McAlindon, *et al.*, entitled *Effectiveness of Glucosamine For Symptoms of Knee Osteoarthritis: Results From and Internet-Based Randomized Double-Blind Controlled Trial*, 117(9) Am. J. Med. 649-9 (Nov. 2004), concluded that "glucosamine was no more effective than placebo in treating symptoms of knee osteoarthritis," meaning glucosamine is ineffective. *Id.* at 646 ("[W]e found no difference between the glucosamine and placebo groups in any of the outcome measures, at any of the assessment time points.").

51.    Many studies have also confirmed there is a significant "placebo" effect with respect to consumption of Move Free Products represented to be effective in providing joint health benefits such as Defendant's Move Free Products.

52.    Indeed, more than 30% of persons who took placebos in these studies believed that they were experiencing joint health benefits when all they were taking was a placebo.

53.    A 2004 study by Cibere, *et al*., entitled *Randomized, Double-Blind, Placebo-Controlled Glucosamine Discontinuation Trial In Knee Osteoarthritis*, 51(5) Arthritis Care & Research 738-45 (Oct. 15, 2004), studied users of glucosamine who claimed to have experienced at least moderate improvement after starting glucosamine. These patients were divided into two groups – one group that was given glucosamine and another group that was given a placebo. For six months, the primary outcome observed was the proportion of disease flares in the glucosamine and placebo groups. A secondary outcome was the time to disease flare. The study results reflected that there were no differences in either the primary or secondary outcomes for glucosamine and placebo. The authors concluded that the study

BLOOD HURST & O'REARDON, LLP

FIRST AMENDED CLASS ACTION COMPLAINT

00124768

provided no evidence of symptomatic benefit from continued use of glucosamine – in other words, any prior perceived benefits were due to the placebo effect and ***not*** glucosamine. *Id.* at 743 ("In this study, we found that knee OA disease flare occurred as frequently, as quickly, and as severely in patients who were randomized to continue receiving glucosamine compared with those who received placebo. As a result, the efficacy of glucosamine as a symptom-modifying drug in knee OA is not supported by our study.").

54.     A 2008 study by Rozendaal, *et al.*, entitled *Effect of Glucosamine Sulfate on Hip Osteoarthritis*, 148 Ann. of Intern. Med. 268-77 (2008), assessed the effectiveness of glucosamine on the symptoms and structural progression of hip osteoarthritis during two years of treatment. Rozendaal and co-authors examined 222 subjects and concluded that glucosamine was no better than placebo in reducing pain, improving physical function, or impacting the structural progression of osteoarthritis.

55.     On July 7, 2010, Wilkens, *et al.*, reported that there was no difference between placebo and glucosamine for the treatment of low back pain and lumbar osteoarthritis and that neither glucosamine nor placebo were effective in reducing pain related disability. The researchers also concluded that, "Based on our results, it seems unwise to recommend glucosamine to all patients" with low back pain and lumbar osteoarthritis. Wilkens, *et al.*, *Effect of Glucosamine on Pain-Related Disability in Patients With Chronic Low Back Pain and Degenerative Lumbar Osteoarthritis*, 304(1) JAMA 45-52 (July 7, 2010).

56.     Kwoh *et al.* (2014) is a report from a randomized, placebo-controlled clinical trial measuring the effect of oral glucosamine hydrochloride on joint degradation, and secondarily, pain and function in 201 individuals. Kwoh, *et al.*, *Effect of Oral Glucosamine on Joint Structure in Individuals With Chronic Knee Pain*, Arthritis & Rheumatology, Vol 66, No. 4, 930-39 (Apr. 2014). Kwoh, which studied a mix of subjects with and without osteoarthritis, concluded that glucosamine supplementation provided no structural, pain or function benefits.

57.     Runhaar *et al.* (2015) was an independently-analyzed double-blind, placebo-controlled, factorial design trial testing a diet-and-exercise program and 1500mg oral

FIRST AMENDED CLASS ACTION COMPLAINT

glucosamine or placebo on the incidence of knee osteoarthritis among 407 women at high-risk for knee osteoarthritis. Runhaar *et al.*, *Prevention of Knee Osteoarthritis in Overweight Females: The First Preventative Randomized Controlled Trial in Osteoarthritis*, Am J Med, 128(8):888-895 (2015). Researchers examined the impact of daily glucosamine consumption on the incidence of knee osteoarthritis, as well as on pain and physical function. After 2.5 years, no effect from glucosamine was found on subjects' overall quality of life or knee pain, physical function, or the incidence of knee osteoarthritis.

58.     A 2017 study by Roman-Blas, *et al.*, entitled *The combined therapy with chondroitin sulfate plus glucosamine sulfate or chondroitin sulfate plus glucosamine hydrochloride does not improve joint damage in an experimental model of knee osteoarthritis in rabbits*, European Journal of Pharmacology, Vol. 794 8-14 (Jan. 2017), concluded that the combination of chondroitin sulfate and glucosamine sulfate and the combination of chondroitin sulfate and glucosamine hydrochloride failed to improve structural damage or ameliorate the inflammatory profile of joint tissues.

**Meta-analyses and Scientific Review Articles**

59.     Well-conducted meta-analyses are considered a higher level of evidence than individual clinical trials as they provide a method to evaluate the aggregated results of all relevant studies according to their pooled effects and methodological quality.

60.     In a 2007 meta-analysis, Vlad, *et al.*, reviewed all studies involving glucosamine hydrochloride and concluded that "[g]lucosamine hydrochloride is not effective." *Glucosamine for Pain in Osteoarthritis*, 56:7 Arthritis Rheum. 2267-77 (2007); *see also id.* at 2275 ("[W]e believe that there is sufficient information to conclude that glucosamine hydrochloride lacks efficacy for pain in OA.").

61.     A 2010 meta-analysis by Wandel, *et al.*, entitled *Effects of Glucosamine, Chondroitin, Or Placebo In Patients With Osteoarthritis Or Hip Or Knee:  Network Meta-Analysis*, BMJ 341:c4675 (2010), examined prior studies involving glucosamine and chondroitin, alone or in combination, and whether they relieved the symptoms or progression of arthritis of the knee or hip. This independent research team reported that glucosamine and

chondroitin, alone or in combination, did not reduce joint pain or have an impact on the narrowing of joint space: "Our findings indicate that glucosamine, chondroitin, and their combination do not result in a relevant reduction of joint pain nor affect joint space narrowing compared with placebo." *Id.* at 8. The authors further concluded "[w]e believe it unlikely that future trials will show a clinically relevant benefit of any of the evaluated preparations." *Id.*

62.  In 2011, Miller and Clegg, after surveying the clinical study history of glucosamine and chondroitin, concluded that, "[t]he cost-effectiveness of these dietary supplements alone or in combination in the treatment of OA has not been demonstrated in North America." Miller, K. and Clegg, D., *Glucosamine and Chondroitin Sulfate*, Rheum. Dis. Clin. N. Am. 37 103-118 (2011).

63.  In 2012, a report by Rovati, *et al.*, entitled *Crystalline glucosamine sulfate in the management of knee osteoarthritis: efficacy, safety, and pharmacokinetic properties*, Ther Adv Muskoloskel Dis 4(3) 167-180, noted that glucosamine hydrochloride "ha[s] never been shown to be effective."

64.  The recent meta-analysis by Eriksen *et al.* (2014) included 25 glucosamine trials, which collectively involved 3,458 patients. Eriksen, P *et al.*, *Risk of bias and brand explain the observed inconsistency in trials on glucosamine for symptomatic relief of osteoarthritis: A meta-analysis of placebo-controlled trials*, Arthritis Care & Research 66:1844-1855 (2014). Eriksen and co-authors found that "[i]n accordance with a previous analysis, we found that glucosamine hydrochloride had no effect on pain" and "glucosamine by and large has no clinically important effect."

65.  A 2016 scientific review by Vasiliadis, *et al.*, entitled *Glucosamine and chondroitin for the treatment of osteoarthritis*, World J. Orthop., Vol. 8, Issue 1 (Jan. 18, 2017), concluded that "[t]here is currently no convincing information on the efficacy of [glucosamine] or [chondroitin] as treatment options in [osteoarthritis], *id.* at 8, and "when only the information from best quality trials is considered, then none of these supplements seem to demonstrate any superiority [as compared to placebos]," *id.* at 6.

FIRST AMENDED CLASS ACTION COMPLAINT

00124768

BLOOD HURST & O'REARDON, LLP

66.     In 2017, Runhaar and co-authors presented results from their meta-analysis of six glucosamine studies (1,663 patients) where the original authors agreed to share their study data for critical re-analysis. Runhaar *et al.*, *No Treatment Effects of Oral Glucosamine for Subgroups of Knee and Hip Osteoarthritis Patients: An Individual Patient Data Meta-Analysis from the OA Trial Bank*, Osteoarthritis and Cartilage, Vol. 25 (2017). Runhaar 2017 is an "individual patient data meta-analysis" or IPD, which is considered a gold standard of systematic review. The Runhaar IPD meta-analysis concluded that glucosamine has no effect on pain or physical function.

**Professional Guidelines**

67.     Professional guidelines are also consistent in their recommendation against using glucosamine or chondroitin.

68.     For example, the National Collaborating Centre for Chronic Conditions ("NCCCC") reported "the evidence to support the efficacy of glucosamine hydrochloride as a symptom modifier is poor" and the "evidence for efficacy of chondroitin was less convincing." NCCCC, Osteoarthritis National Clinical Guideline for Care and Management of Adults, Royal College of Physicians, London 2008. Consistent with its lack of efficacy findings, the NCCCC Guideline did not recommend the use of glucosamine or chondroitin for treating osteoarthritis. *Id.* at 33.

69.     In December 2008, the American Academy of Orthopaedic Surgeons published clinical practice guidelines for the "Treatment of Osteoarthritis of the Knee (Non-Arthroplasty)," and recommended that "glucosamine and sulfate or hydrochloride not be prescribed for patients with symptomatic OA of the knee." Richmond *et al.*, *Treatment of osteoarthritis of the knee (nonarthroplasty)*, J. Am. Acad. Orthop. Surg. Vol. 17 No. 9 591-600 (2009). This recommendation was based on a 2007 report from the Agency for Healthcare Research and Quality (AHRQ), which states that "the best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination did not have any clinical benefit in patients with primary OA of the knee." Samson, *et al.*, *Treatment of Primary and Secondary Osteoarthritis of the Knee*, Agency for Healthcare Research and Quality, 2007

BLOOD HURST & O'REARDON, LLP

00124768

1    Sep 1. Report No. 157.

2         70.    In 2009, a panel of scientists from the European Food Safety Authority

3    ("EFSA") (a panel established by the European Union to provide independent scientific advice

4    to improve food safety and consumer protection), reviewed nineteen studies submitted by an

5    applicant, and concluded that "a cause and effect relationship has not been established between

6    the consumption of glucosamine hydrochloride and a reduced rate of cartilage degeneration in

7    individuals without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies,

8    *Scientific Opinion on the substantiation of a health claim related to glucosamine*

9    *hydrochloride and reduced rate of cartilage degeneration and reduced risk of osteoarthritis*,

10   EFSA Journal (2009), 7(10):1358.

11        71.    In a separate opinion from 2009, an EFSA panel examined the evidence for

12   glucosamine (either hydrochloride or sulfate) alone or in combination with chondroitin sulfate

13   and maintenance of joints. The claimed effect was "joint health," and the proposed claims

14   included "helps to maintain healthy joint," "supports mobility," and "helps to keep joints

15   supple and flexible." Based on its review of eleven human intervention studies, three meta-

16   analyses, 21 reviews and background papers, two animal studies, one in vitro study, one short

17   report, and one case report, the EFSA panel concluded that "a cause and effect relationship has

18   not been established between the consumption of glucosamine (either as glucosamine

19   hydrochloride or as glucosamine sulphate), either alone or in combination with chondroitin

20   sulphate, and the maintenance of normal joints." EFSA Panel on Dietetic Products, Nutrition

21   and Allergies, *Scientific Opinion on the substantiation of health claims related to glucosamine*

22   *alone or in combination with chondroitin sulphate and maintenance of joints and reduction of*

23   *inflammation*, EFSA Journal (2009), 7(9):1264.

24        72.    In 2012, EFSA examined the evidence glucosamine sulphate or glucosamine

25   hydrochloride, and a claimed effect of "contributes to the maintenance of normal joint

26   cartilage." Based on its review of 61 references provided by Merck Consumer Healthcare, the

27   EFSA panel concluded that "a cause and effect relationship has not been established between

28   the consumption of glucosamine and maintenance of normal joint cartilage in individuals

BLOOD HURST & O'REARDON, LLP

14                    Case No. 3:17-cv-03529-VC
FIRST AMENDED CLASS ACTION COMPLAINT

without osteoarthritis." EFSA Panel on Dietetic Products, Nutrition and Allergies, *Scientific Opinion on the substantiation of a health claim related to glucosamine and maintenance of normal join*t cartilage, EFSA Journal 2012, 10(5): 2691.

73.     In 2008 and 2013, the American Academy of Orthopaedic Surgeons ("AAOS") made a "strong" recommendation that neither glucosamine nor chondroitin be used for patients with symptomatic osteoarthritis of the knee. *See* American Academy of Orthopaedic Surgeons, Treatment of Osteoarthritis of the Knee: Evidence-Based Guideline (2d ed. 2013). "Twenty-one studies were included as evidence for this recommendation."

74.     Likewise, the American College of Rheumatology ("ACR"), the United Kingdom National Institute for Health and Care Excellence ("NICE"), and the Agency for Healthcare Research and Quality ("AHRQ") (one of the agencies within the United States Department of Health and Human Services) each published clinical guidelines for the treatment of osteoarthritis based on a critical review of published clinical research, including for glucosamine and chondroitin. These professional groups also recommend against using glucosamine or chondroitin for managing the pain, reduced function, and quality of life issues associated with osteoarthritis. Hochberg MC *et al.*, *American College of Rheumatology 2012 Recommendations for the Use of Nonpharmacologic and Pharmacologic Therapies in Osteoarthritis of the Hand, Hip, and Knee*, Arthritis Care & Research, 64(4):465-474 (2012); NICE National Institute for Health and Care Excellence. *Osteoarthritis: Care and management in adults*. Clinical guideline 177. Methods, evidence and recommendations (February 2014); Samson DJ *et al.*, *Treatment of Primary and Secondary Osteoarthritis of the Knee. Evidence Report/Technology Assessment*, Number 157. Prepared for Agency for Healthcare Research and Quality, U.S. Department of Health and Human Services, Publication No. 07-E012 (2007).

75.     The AAOS, ACR, NICE and AHRQ guidelines were based on systematic reviews and/or meta-analyses of all of the available study data. For example, the ACR specifically cited its reliance on the GAIT study coupled with four meta-analyses that "failed to demonstrate clinically important efficacy for these agents": Towheed, 2005; Vlad, 2007;

BLOOD HURST & O'REARDON, LLP

1   Reichenbach, 2007; and Wandel, 2010. The NICE authors' conclusion that practitioners

2   should "not offer glucosamine or chondroitin products" was based on a review that included

3   Towheed 2005, which included 25 glucosamine RCTs, Reichenbach, 2007, which included 22

4   chondroitin RCTs, and seven studies that compared glucosamine plus chondroitin versus

5   placebo. The 2007 AHRQ assessment was based on review of 21 glucosamine/chondroitin

6   studies, including GAIT. The AAOS' 2013 "strong" recommendation against glucosamine and

7   chondroitin was based on expert analysis and meta-analyses of 12 glucosamine studies, 8

8   chondroitin studies, and one study (GAIT) that assessed both.

9   **IV.**    *The Impact of Defendant's Wrongful Conduct*

10      76.    Despite clinical studies demonstrating the Move Free Products' ineffectiveness,

11   Defendant conveyed and continues to convey one uniform joint health message: that the Move

12   Free Products are joint health supplements capable of supporting and benefiting joint health.

13      77.    As the inventor, manufacturer, and distributor of the Move Free Products,

14   Defendant possesses specialized knowledge regarding the Move Free Products' content and

15   effects of their ingredients, and Defendant is in a superior position to know whether the Move

16   Free Products work as advertised.

17      78.    Specifically, Defendant knew, but failed to disclose, or should have known, that

18   the Move Free Products cannot benefit joint health and that well-conducted, clinical studies

19   have found the Move Free Products' primary ingredients unable to support or benefit joint

20   health.

21      79.    Plaintiffs and the class members have been and will continue to be deceived or

22   misled by Defendant's false and deceptive joint health representations.

23      80.    Defendant's joint health representations and omissions were a material factor in

24   influencing Plaintiffs' and the class members' decision to purchase the Move Free Products. In

25   fact, the only purpose for purchasing the Move Free Products is to obtain the represented joint

26   health benefits.

27      81.    Defendant's conduct has injured Plaintiffs and the class members because

28   Defendant's Move Free Products are worthless and cannot support or benefit joint health as

BLOOD HURST & O'REARDON, LLP

advertised.

82.     Had Plaintiffs and the class members known the truth about Defendant's Move Free Products, they would not have purchased the Move Free Products and would not have paid the prices they paid for the Move Free Products.

83.     Plaintiffs and each class member were harmed by purchasing Defendant's Move Free Products because none of the Move Free Products are capable of providing their advertised benefits. As a result, Plaintiffs and each class member lost money and property by way of purchasing Defendant's ineffective and worthless capsules.

## CLASS DEFINITION AND ALLEGATIONS

84.     Plaintiffs, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), bring this action on behalf of the following classes:

**California Class**

All persons who purchased in the state of California any of the Move Free Products, within the applicable statute of limitations, for personal use until the date notice is disseminated.

**California Senior Class**

All senior citizens who purchased in the state of California any of the Move Free Products, within the applicable statute of limitations, for personal use until the date notice is disseminated.

**New York Class**

All persons who purchased in the state of New York any of the Move Free Products, within the applicable statute of limitations, for personal use until the date notice is disseminated.

85.     Excluded from each Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Move Free Products for resale, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

86.     Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same

BLOOD HURST & O'REARDON, LLP

00124768

evidence as would be used to prove those elements in individual actions alleging the same claims.

87. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold many thousands of units of Move Free Products to Class members.

88. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)     Whether the representations discussed herein that Defendant made about its Move Free Products were or are true, misleading, or likely to deceive;

(b)     Whether Defendant's conduct violates public policy;

(c)     Whether Defendant engaged in false or misleading advertising;

(d)     Whether Defendant's conduct constitutes violations of the laws asserted herein;

(e)     Whether Plaintiffs and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

(f)     Whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

89. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

90. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class

1   members will be fairly and adequately protected by Plaintiffs and their counsel.

2   91.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure**

3   **23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiffs

4   and the other Class members, thereby making appropriate final injunctive relief and

5   declaratory relief, as described below, with respect to Class as a whole.

6   92.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is

7   superior to any other available means for the fair and efficient adjudication of this controversy,

8   and no unusual difficulties are likely to be encountered in the management of this class action.

9   The damages or other financial detriment suffered by Plaintiffs and the other Class members

10  are relatively small compared to the burden and expense that would be required to individually

11  litigate their claims against Defendant, so it would be impracticable for Class members to

12  individually seek redress for Defendant's wrongful conduct. Even if Class members could

13  afford individual litigation, the court system could not. Individualized litigation creates a

14  potential for inconsistent or contradictory judgments, and increases the delay and expense to

15  all parties and the court system. By contrast, the class action device presents far fewer

16  management difficulties, and provides the benefits of single adjudication, economy of scale,

17  and comprehensive supervision by a single court.

18  **CLAIMS ALLEGED**

19  **COUNT I**

20  **Violation of the California Unfair Competition Law ("UCL")**

21  **Cal. Bus. & Prof. Code §§ 17200, *et seq.***

22  93.   Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

23  94.   Plaintiff Gordon Noboru Yamagata brings this claim individually and on behalf

24  of the California Class and the California Senior Class.

25  95.   Plaintiff and Defendant are "persons" within the meaning of the UCL. Cal. Bus.

26  & Prof. Code § 17201.

27  96.   The UCL defines unfair competition to include any "unlawful, unfair or

28  fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading

BLOOD HURST & O'REARDON, LLP

advertising." Cal. Bus. Prof. Code § 17200.

97.    In the course of conducting business, Defendant committed unlawful business practices by, among other things, making the representations (which also constitutes advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) and Business & Professions Code §§ 17200, *et seq.*, 17500, *et seq.*, and the common law.

98.    Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

99.    In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding Move Free Products in its advertising and labeling, including on the Move Free Products' packaging, as set forth more fully herein. There is no societal benefit from false advertising – only harm. Plaintiff and the other Class members paid for a valueless product that is not capable of conferring the benefits promised. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

100.    Further, as set forth in this Complaint, Plaintiff alleges violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code § 17200, *et seq*.

101.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Business & Professions Code § 17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of

BLOOD HURST & O'REARDON, LLP

00124768

conducting business, Defendant committed "fraudulent business act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the Move Free Products in its advertising, including on the Move Free Products' packaging and labeling, as set forth more fully herein. Defendant made the misrepresentations and omissions regarding the efficacy of its Move Free Products, among other ways, by misrepresenting on each and every Move Free Product's packaging and labeling that the Products are effective when taken as directed, when, in fact, the representations are false and deceptive, and the Move Free Products are not capable of conferring the promised health benefits.

102.   Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200, *et seq*.

103.   Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Move Free Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Move Free Products and Defendant's unlawful, unfair, and fraudulent practices.

104.   Defendant knew, or should have known, that its material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendant for Move Free Products that are valueless and that are incapable of actually supporting, maintaining, improving or benefiting joint health.

105.   As a result of its deception, Defendant was unjustly enriched by receiving payments from Plaintiff and the Class in return for providing Plaintiff and the Class Move Free Products that do not perform as advertised.

106.   Unless restrained and enjoined, Defendant will continue to engage in the unlawful, unfair and fraudulent conduct described herein.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

107.    Accordingly, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendant of all money obtained from Plaintiff and the other members of the Class collected as a result of Defendant's unfair competition, and for an injunction prohibiting Defendant from continuing and further engaging in its unlawful, unfair and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

## COUNT II

### Violation of the California Consumers Legal Remedies Act ("CLRA")

### Cal. Civ. Code §§ 1750, *et seq.*

108.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

109.    Plaintiff Gordon Noboru Yamagata brings this claim individually and on behalf of the California Class and the California Senior Class.

110.    Plaintiff is a "consumer," Defendant is a "person," and the Move Free Products are "goods" within the meaning of the CLRA. Cal. Civ. Code § 1761(a), (c) and (d).

111.    Defendant's sale and advertisement of its Move Free Products constitute "transactions" within the meaning of the CLRA. Cal. Civ. Code § 1761(e).

112.    The CLRA declares as unlawful the following unfair methods of competition and unfair or deceptive acts or practices when undertaken by any person in a transaction intended to result, or which results in the sale of goods to any consumer:

(5)    Representing that goods … have … approval, characteristics, … uses [and] benefits … which [they do] not have ….

(7)    Representing that goods … are of a particular standard, quality or grade … if they are of another.

(9)    Advertising goods …with intent not to sell them as advertised.

(16)    Representing that [goods] have been supplied in accordance with a previous representation when [they have] not.

Cal. Civ. Code § 1770(a)(5), (7), (9) and (16).

00124768

113.    Defendant violated the CLRA by representing that its Move Free Products are beneficial for joint health, when, in reality, the Move Free Products cannot provide their advertised benefits and the Move Free Products' ingredients are ineffective at improving, supporting, maintaining or benefiting the health of human joints.

114.    Defendant knew or should have known its joint health representations were false and misleading, and that by omitting the ineffectiveness of its Move Free Products it was omitting a material fact that would alter any consumer's decision to purchase the Move Free Products.

115.    Defendant's violations of the CLRA proximately caused injury in fact to Plaintiff and the Class.

116.    Plaintiff and the Class members purchased Defendant's Move Free Products on the belief that they would receive the advertised joint benefits from the Move Free Products. Indeed, no consumer would purchase a joint health supplement unless he or she believed it was capable of providing meaningful joint benefits.

117.    Defendant's Move Free Products, however, are worthless and cannot provide their advertised benefits. Since the Move Free Products lack any value, Plaintiff and each Class member was injured by the mere fact of their purchase.

118.    Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

119.    Pursuant to Cal. Civ. Code § 1782(a), Defendant was notified in writing by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter is attached hereto as Exhibit A.

///

///

///

BLOOD HURST & O'REARDON, LLP

120.     Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the Act. Therefore, Plaintiff further seeks claims for actual, punitive and statutory damages, as appropriate. Such damages include statutory damages awards under §1780(b)(1) for the members of the California Senior Class.

121.     Defendant's conduct is fraudulent, wanton, and malicious.

122.     Pursuant to § 1780(d) of the Act, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

## COUNT III

### Violation of the California False Advertising Law ("FAL")

### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

123.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

124.     Plaintiff Gordon Noboru Yamagata brings this claim individually and on behalf of the California Class and the California Senior Class.

125.     The FAL, in relevant part, states that "[i]t is unlawful for any … corporation … with intent … to dispose of … personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement … which is *untrue* or *misleading*, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500 (emphasis added).

126.     The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

127.     Defendant violated the FAL by making untrue or misleading representations that its Move Free Products are beneficial for joint health, when, in reality, the Move Free Products cannot provide any of their advertised benefits and the Move Free Products' ingredients are ineffective at improving, supporting or maintaining the health of human joints.

BLOOD HURST & O'REARDON, LLP

00124768

BLOOD HURST & O'REARDON, LLP

128.    As a direct and proximate result of Defendant's untrue and misleading advertising, Plaintiff and the Class members have suffered injury in fact and have lost money.

129.    Accordingly, Plaintiff requests that the Court order Defendant to restore the money Defendant has received from Plaintiff and the members of the Class, and that the Court enjoin Defendant from continuing its unlawful practices, and engage in corrective advertising.

## COUNT IV

### Violation of N.Y. Gen. Bus. Law ("GBL") §§ 349 and 350

130.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

131.    Plaintiff Stamatis F. Pelardis brings this claim individually and on behalf of the New York Class.

132.    Defendant's acts and practices as described herein were consumer-oriented because they undermined the ability of consumers, including Plaintiff and the Class, to evaluate their market options and to make free and intelligent choices.

133.    Section 349(a) of the GBL declares as unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

134.    Section 350 of the GBL declares as unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

135.    Defendant violated the GBL by representing that its Move Free Products are beneficial for joint health, when, in reality, the Move Free Products cannot provide their advertised benefits and the Move Free Products' ingredients are ineffective at improving, supporting, maintaining or benefiting the health of human joints.

136.    Defendant's violations caused injury to Plaintiff and the Class.

137.    Plaintiff and the Class members purchased Defendant's Move Free Products on the belief that their joints would benefit from the Move Free Products. Indeed, no consumer would purchase a joint health supplement unless he or she believed it worked.

138.    Defendant's Move Free Products, however, are worthless and cannot provide their advertised benefits. Accordingly, Plaintiff and the other members of the Class have been injured in that they purchased the Move Free Products reasonably believing they could provide

25

1 the promised benefits.

2     139.   Plaintiff and the Class members are entitled to recover actual damages,

3 statutory damages, treble damages, reasonable attorneys' fees, and seek an order enjoining

4 Defendant from continuing its false and deceptive conduct.

5 **JURY DEMAND**

6     140.   Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

7 **REQUEST FOR RELIEF**

8     WHEREFORE, Plaintiffs, individually and on behalf of the other members of the

9 proposed Class, respectfully request that the Court enter judgment in Plaintiffs' favor and

10 against Defendant as follows:

11     A.   Declaring that this action is a proper class action, certifying the Classes as

12 requested herein, designating Plaintiffs as Class Representatives and appointing the

13 undersigned counsel as Class Counsel;

14     B.   Ordering restitution and disgorgement of all profits and unjust enrichment that

15 Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful,

16 unfair and fraudulent business practices;

17     C.   Ordering injunctive relief as permitted by law or equity, including enjoining

18 Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant

19 to engage in a corrective advertising campaign;

20     D.   Ordering damages for Plaintiffs and the Classes;

21     E.   Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and

22 the other members of the Class;

23     F.   Ordering Defendant to pay both pre- and post-judgment interest on any

24 amounts awarded; and

25 ///

26 ///

27 ///

28 ///

BLOOD HURST & O'REARDON, LLP

Case No. 3:17-cv-03529-VC

FIRST AMENDED CLASS ACTION COMPLAINT

00124768

1      G.      Ordering such other and further relief as may be just and proper.

2                                           Respectfully submitted,

3   Dated: August 11, 2017                  BLOOD HURST & O'REARDON, LLP
                                            TIMOTHY G. BLOOD (149343)
4                                           THOMAS J. O'REARDON II (247952)

5                                           By:        s/  Timothy G. Blood
6                                                    TIMOTHY G. BLOOD

7                                           701 B Street, Suite 1700
                                            San Diego, CA  92101
8                                           Tel: 619/338-1100
                                            619/338-1101 (fax)
9                                           tblood@bholaw.com
                                            toreardon@bholaw.com

10                                          CARLSON LYNCH SWEET KILPELA
                                               & CARPENTER, LLP
11                                          TODD D. CARPENTER (234464)
                                            1350 Columbia Street, Suite 603
12                                          San Diego, CA  92101
                                            Tel: 619/762-1910
13                                          619/756-6991 (fax)
                                            tcarpenter@carlsonlynch.com
14
15                                          *Attorneys for Plaintiffs*
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O'REARDON, LLP

27                          Case No. 3:17-cv-03529-VC
FIRST AMENDED CLASS ACTION COMPLAINT

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on August 11, 2017, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4   e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have

5   mailed the foregoing document or paper via the United States Postal Service to the non-

6   CM/ECF participants indicated on the Electronic Mail Notice List.

7        I certify under penalty of perjury under the laws of the United States of America that

8   the foregoing is true and correct. Executed on August 11, 2017.

9

10                                                 *s/ Timothy G. Blood*
                                           TIMOTHY G. BLOOD

11
                                           BLOOD HURST & O'REARDON, LLP
12                                          701 B Street, Suite 1700
                                           San Diego, CA  92101
13                                          Tel: 619/338-1100
                                           619/338-1101 (fax)
14                                          tblood@bholaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    28              Case No. 3:17-cv-03529-VC