1

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)

2

THOMAS J. O'REARDON II (247952)
501 West Broadway, Suite 1490

3

San Diego, CA 92101
Tel: 619/338-1100

4

619/338-1101 (fax)
tblood@bholaw.com

5

toreardon@bholaw.com

6

Class Counsel

7

8

## UNITED STATES DISTRICT COURT

9

### NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

10

GORDON NOBORU YAMAGATA and
STAMATIS F. PELARDIS, individually and

11

on behalf of all others similarly situated,

12

Plaintiffs,

13

v.

14

RECKITT BENCKISER LLC,

15

Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-cv-03529-VC

**DECLARATION OF TIMOTHY G. BLOOD IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL**

**CLASS ACTION**

Hrg Date:    June 24, 2021
Time:         2:00 p.m.

District Judge Vince Chhabria
Courtroom 4, 17th Floor

Complaint Filed:    June 19, 2017

**JURY TRIAL DEMANDED**

BLOOD HURST & O' REARDON, LLP

00176244

I, TIMOTHY G. BLOOD, declare:

1.     I am the managing partner of the law firm Blood Hurst & O'Reardon, LLP, and an attorney duly licensed to practice before the courts of the State of California and this Court. I am court-appointed class counsel pursuant to Federal Rule of Civil Procedure 23(g) in the above-entitled matter and in *Carrigan v. Reckitt Benckiser LLC*, pending in the United States District Court for the Northern District of Illinois. I have personal knowledge of the matters stated in this declaration except those stated on information and belief, and as to those, I believe them to be true. If called upon, I could and would competently testify to them.

## I.     INTRODUCTION

2.     I submit this declaration in support of Plaintiffs' motion for preliminary approval of the Stipulation of Settlement (the "Settlement Agreement" or "SA"). The Settlement Agreement is attached as **Exhibit A** to this Declaration. A copy of the [Proposed] Order Preliminarily Approving Class Action Settlement is attached as Exhibit 1 to the Settlement Agreement and submitted separately to the Court. Terms that are capitalized in this declaration are intended to refer to matters defined in the Settlement Agreement.

3.     On March 3, 2021, the Parties submitted a proposed settlement agreement. ECF Nos. 202-203. On March 25, 2021, the Court heard oral argument and denied the motion for preliminary approval without prejudice to re-filing. ECF Nos. 214. As discussed below and in the accompanying renewed motion for preliminary approval, the Parties held numerous negotiations following the previous hearing, which led to the revised Settlement Agreement submitted with this motion. For the Court's convenience, a comparison of the previous and revised settlement is attached as **Exhibit B** to this Declaration.

4.     The Settlement was reached after extensive litigation spanning nearly four years. The motion practice here and in the related *Carrigan* class action was substantial and included motions to compel further discovery responses, motions for class certification, a motion for summary judgment, a petition for interlocutory appeal and numerous motions to strike expert testimony. All the motions were heavily contested and fully briefed, with some involving multiple rounds of briefing. The Actions also involved substantial discovery. Plaintiffs' Counsel (1) conducted and

BLOOD HURST & O' REARDON, LLP

defended 30 depositions, including those of Defendant's corporate designees, current and former marketing, science and regulatory employees, scientific experts, and third-party scientists; (2) reviewed over 303,000 pages of documents produced by Defendant; and (3) subpoenaed documents and testimony from 18 third parties who produced thousands of pages of documents. Plaintiffs' Counsel also responded to discovery served on Plaintiffs, defended Plaintiffs' depositions, and worked with more than seven of their own expert witnesses and additional consultants to prepare for class certification, summary judgment, and trial, including preparing and exchanging expert reports and conducting and defending expert depositions.

## II.     PRE-SUIT INVESTIGATION AND THE COMPLAINTS

5.     Plaintiffs' Counsel conducted a significant investigation before this Action was filed. We began investigating marketing claims by Reckitt Benckiser, LLC ("RB" or "Defendant") regarding the joint health benefits of Schiff Move Free® Advanced ("MFA"). These efforts included obtaining advertisements and labels from a variety of sources throughout the country. We then assessed the veracity of the express and implied messages by analyzing the purported active ingredients and the scientific literature about them. MFA posed some additional challenges because it includes substances in addition to glucosamine and chondroitin, including an ingredient unique to MFA known as "FruiteX-B."

6.     On June 22, 2017, a class action complaint was filed in this Court on behalf of Gordon Yamagata and Stamatis Pelardis. The complaint alleged violations of California's Consumers Legal Remedies Act ("CLRA"), Civ. Code §§1750, et seq., Unfair Competition Law ("UCL"), Bus. & Prof. Code §§17200, et seq., and New York General Business Law section 349 and 350 ("GBL"). (ECF No. 1). On August 11, 2017, Plaintiffs filed a First Amended Complaint, which included a claim for damages under the CLRA after the expiration of the notice period. (ECF No. 24). Defendant answered the amended complaint on August 25, 2017. (ECF No. 25). On March 2, 2021, the operative Second Amended Complaint was filed on behalf of a nationwide class to conform to the proposed Settlement Class. (ECF No. 201).

7.     On October 22, 2018, Plaintiff Maureen Carrigan filed a class action complaint in the United States District Court for the Northern District of Illinois captioned, *Carrigan v. Reckitt*

BLOOD HURST & O' REARDON, LLP

*Benckiser LLC*, Case No. 1:18-cv-07073 (N.D. Ill.) ("*Carrigan*"). *Carrigan* arises from the same facts of alleged false advertising and was filed on behalf of consumers who purchased Move Free Advanced in Illinois between May 28, 2015 and the present. It asserted violations of section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, *et seq.* (the "ICFA").

8.      On September 17, 2020, on behalf of Plaintiffs Lori Coletti, Ann-Marie Maher, Carol Marshall, Deborah A. Rawls, Oneita Steele, and Maxine Tishman, Class Counsel served Defendant with another class action complaint ("*Coletti*"). *Coletti* was to be filed in the District of Vermont on behalf of a MFA purchasers from states other than California, New York, and Illinois also alleging violations of state consumer protection laws arising out of the marketing and advertising of Move Free Advanced.

## III.     SUMMARY OF NON-EXPERT DISCOVERY EFFORTS

9.      Discovery in these cases has been substantial. It involved hundreds of thousands of pages of documents produced by Defendant, subpoenas to 18 third-parties, 30 depositions, and the exchange of 21 reports from 14 experts.

10.      **Written Discovery and Document Requests:** Plaintiffs' Counsel served Defendant with 29 interrogatories, 422 requests for admissions, and 124 document requests. Dozens of meet and confer discussions occurred throughout the course of the litigation. As a result of these efforts, Defendant supplemented numerous discovery responses and produced previously withheld or redacted documents.

11.      **Defendant's Document Production:** Defendant produced, and Plaintiffs' Counsel received, reviewed, analyzed, and organized over 303,000 pages of discovery, including documents and communications concerning scientific studies relating to joint health, glucosamine, chondroitin, FruiteX-B and the other ingredients in MFA, advertising and marketing-related strategy and research, and financial information, including the sales of MFA and its competitors.

12.      This discovery was obtained after numerous discussions between the Parties, including negotiation over several confidentiality agreements and electronically stored information ("ESI") protocols. In connection with Defendant's production of ESI, the Parties held extensive

meetings about coordinating and implementing a protocol relating to the methods of searching for and producing ESI.

13.     To efficiently and effectively review this voluminous ESI (which exceeded 116 GB), Plaintiffs' Counsel retained outside electronic discovery vendors and created a coding database specifically for this Action.

14.     **Third-Party Discovery Efforts:** Plaintiffs' Counsel served subpoenas for documents or testimony on 18 third parties who were involved in the marketing, science, and retail sale of MFA. In response to these subpoenas and negotiated ESI protocols with many of these third parties as well, Plaintiffs obtained over 5,907 pages of relevant and probative information, which were reviewed and analyzed. This page-count does not include the voluminous retail sales data spreadsheets provided by the eight retailers who produced detailed accountings of their MFA sales.

15.     Plaintiffs subpoenaed the major retailers of MFA: Walmart, Sam's Club, Costco, Target, Rite Aid, CVS, BJ's Wholesale Club, Walgreens, and Amazon.com. As a result of extensive meet and confer efforts throughout the litigation, we obtained voluminous sales data relating to Move Free Advanced. This sales data, which is from the retailers responsible for over 90% of MFA retail sales, was used in connection with motions for class certification, expert reports, and mediation.

16.     As discussed in Paragraphs 60-64 below, Class Counsel has recently pursued additional discovery from these retailers to obtain Class Member contact information so the Settlement Administrator can provide direct email or mail notice to as many Class Members as reasonably practicable. As a result of meet and confer efforts with each of these retailers (who are all represented by different in-house or outside counsel), Class Counsel is obtaining additional information that will enable direct notice to be provided to millions of Class Members.

17.     In addition to subpoenaing each of the major MFA retailers, Plaintiffs subpoenaed documents from the main third-party manufacturer and the scientists involved in FruiteX-B, one of the main ingredients in MFA. Plaintiffs subpoenaed documents from VDF FutureCeuticals, Inc., a third party that supplies FruiteX-B for MFA and helped fund and conduct the FruiteX-B clinical studies on which Defendant relies. Plaintiffs subpoenaed documents and testimony from Drs.

BLOOD HURST & O' REARDON, LLP

Zbigniew Pietrzkowski and Tania Reyes-Izquierdo. Drs. Pietrzkowski and Reyes-Izquierdo, who were deposed on December 18, 2019 and October 29, 2020, were the principal authors of the FruiteX-B studies. Plaintiffs also deposed Hartley Pond, a marketing and sales executive at VDF and the main sales liaison between VDF and Defendant. After substantial meet and confer efforts, including negotiations regarding document custodians, timeframes, and keywords, VDF produced 4,275 pages of highly relevant information relating to some of the most core studies at issue. This information was analyzed and used extensively by several of Plaintiffs' scientific experts.

18.     Plaintiffs also subpoenaed documents from the University of California at Irvine and one its researchers, Dr. Michael Phelan. Dr. Phelan was hired by VDF to perform statistical analysis for two of the major FruiteX-B study publications. Dr. Phelan was also listed as a co-author on two of the FruiteX-B study manuscripts. As a result of meet and confer efforts with UCI, we received 137 documents (totaling thousands of pages) of important study documents and email communications.

19.     Lastly, Plaintiffs subpoenaed documents and testimony from Robert Keller. Mr. Keller was retained by VDF to hire and coordinate with "contract research organizations" to conduct the FruiteX-B clinical studies. In essence, Mr. Keller was the go-between between VDF's employees/study authors, and the investigators who analyzed the study subjects consuming placebo or FruiteX-B for the studies. Among other responsibilities, Mr. Keller oversaw compiling and providing all the raw study data to VDF for review. Mr. Keller produced 822 pages of important study documentation and provided valuable testimony during his deposition on December 5, 2019.

20.     **Fact Witness and Rule 30(b)(6) Depositions:** Discovery also included Plaintiffs' Counsel taking and defending 23 fact witness and 7 expert depositions. Plaintiffs' Counsel took depositions of Defendant's corporate designees, chief scientists, and the employees responsible for Move Free Advanced product marketing and branding. These deponents included Defendant's Marketing Director of Vitamins, Minerals and Supplements ("VMS"), Senior Associate of Global Medical Affairs, Trade Marketing Director of VMS, Former Senior Brand Manager of Move Free, Former Vice President of Research, Former Medical Advisor, and Research & Development Director of VMS:

BLOOD HURST & O' REARDON, LLP

00176244

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR PRELIMINARY APPROVAL

| DATE | DEPONENT |
|------|----------|
| 6/5/18 | Matthew Bell 30(b)(6) |
| 6/15/18 | Anthony Cam 30(b)(6) |
| 7/16/18 | Carol Cresong 30(b)(6) |
| 10/4/18 | Gordon Yamagata |
| 10/25/18 | Stamatis Pelardis |
| 11/22/19 | Maureen Carrigan |
| 12/5/19 | Robert Keller |
| 12/18/19 | Zbigniew Pietrzkowski |
| 3/12/20 | Natalie Weng |
| 3/13/20 | Sireenah Michlovich |
| 10/9/20 | Marilia de Andrade |
| 10/16/20 | Luke Bucci |
| 10/21/20 | Jason Bortz |
| 10/22/20 | Kathryn Becht |
| 10/27/20 | Louisa Guo |
| 10/29/20 | Tania Reyes-Izquierdo |
| 11/5/20 | Amy Sunderman |
| 11/6/20 | Yongbin Yang |
| 11/10/20 | Heather Santos |
| 11/12/20 | Hartley Pond |
| 11/13/20 | Alejandra Gratson |
| 11/18/20 | Joao Rodriguez |
| 11/20/20 | Anthony Cam |
| 1/18/21 | Daniel Grande |
| 1/19/21 | Colin Weir |
| 1/21/21 | Michael Becker |
| 1/22/21 | Martin Lotz |
| 1/25/21 | On Amir |
| 1/26/21 | Robert Platt |
| 1/27/21 | Farshid Guilak |

21.     **Plaintiffs' Efforts and Discovery Conducted by Defendant:** Throughout the Litigation, Plaintiffs did everything that was required to represent the interests of the Class. Plaintiffs have remained informed and involved. Plaintiffs participated in periodic conferences with Plaintiffs' Counsel to keep informed about the litigation and were involved in decision-making. They also remained available to answer communications from Plaintiffs' Counsel relating to this Action. Plaintiffs also assisted with the review and preparation of pleadings, including the various complaints in which they are named. Plaintiffs have also each reviewed and approved the Settlement.

22.     Defendant served 44 interrogatories, 170 requests for admissions, and 70 document requests on Plaintiffs Yamagata, Pelardis and Carrigan. As a result, throughout the litigation, these Plaintiffs searched for and produced supplemental documents and information in response to

Defendant's continuing discovery requests. Plaintiffs Yamagata, Pelardis, and Carrigan were also deposed. Each devoted a significant amount of time and effort to prepare. During their depositions, they were asked about and provided personal and private medical information.

## IV.   EXPERT WORK

23.     The litigation also involved substantial work with expert witnesses and consultants. In total, Plaintiffs and Defendant each provided expert declarations and reports from fifteen experts. The subjects of expert testimony included the scientific efficacy of Move Free Advanced, Defendant's marketing and advertising strategy for Move Free Advanced, consumer surveys, professional ethics, and the appropriate measure and amount of restitution and damages.

24.     In connection with Plaintiffs' motions for class certification and Defendant's motion for summary judgment, Plaintiffs retained three expert who provided written reports. Dr. Timothy McAlindon is a rheumatologist and clinical researcher at Tufts University. Dr. McAlindon was one of the first independent researchers to conduct a high-quality clinical trial on whether glucosamine can impact joint pain or function. He has been an editor and peer-reviewer for numerous top scientific journals in the field of osteoarthritis, serves on expert panels to create evidence-based treatment guidelines, and publishes meta-analyses on treatments for osteoarthritis. Dr. McAlindon provided declarations in connection with class certification and summary judgment in which he performed systematic reviews of the scientific evidence relating to glucosamine and the other ingredients in MFA. Plaintiffs' second expert is Dr. Farshid Guilak. Dr. Guilak is a Professor of Orthopedic Surgery at Washington University and Director of Research for the Shriners Hospital for Children – St. Louis Shriners. He is renowned for his expertise and research in the etiology and pathogenesis of arthritis. He has published over 330 peer-reviewed articles, co-edited four books in the fields of osteoarthritis, tissue engineering, and biomechanics, has been the Principal Investigator of grants from the NIH, the Arthritis Foundation and others, served as President of the Orthopaedic Research Society, and is Editor-In-Chief of the Journal of Biomechanics and Associate Editor for Osteoarthritis & Cartilage. Dr. Guilak's laboratory focuses on osteoarthritis, investigating the role of biomechanical and biological factors in the onset and progression of osteoarthritis, with an emphasis on developing new therapies for its relief. Dr. Guilak tested each Move Free variation and

BLOOD HURST & O' REARDON, LLP

FruiteX-B alone, to determine their efficacy in healthy and unhealthy joints. Plaintiffs' third expert in connection with class certification and summary judgment was Dr. David Madigan. Dr. Madigan is a former professor of statistics at Columbia University, was chair of the Columbia Department of Statistics, is a Fellow of both the Institute of Mathematical Statistics and the American Statistical Association, was the 36th most cited mathematician worldwide from 1995-2005, and was Editor of the highest impact journal in statistics, *Statistical Science*. Dr. Madigan has published more than 160 technical papers on statistics and biostatistics and has extensive experience with clinical trials, including the design and analysis of pain studies. Here, Dr. Madigan analyzed the actual study data that underlies RB's evidence supporting FruiteX-B.

25.     In connection with Rule 26, Plaintiffs retained seven experts who provided eleven written reports. In addition to Drs. McAlindon, Guilak, and Madigan, Plaintiffs experts included Dr. J. Michael Dennis, a consumer survey expert, Dr. Derek Rucker, a marketing professor who provided expert testimony on the marketing and advertising strategy for Move Free Advanced, Colin Weir who examined retail sales data for Move Free Advanced and provided expert opinion on potential damages, and Heather Rosing, a legal ethicist.

26.     Defendant also produced merits reports from seven experts who provided ten written reports. These included reports from scientists and researchers (Drs. Daniel Grande, Martin Lotz and Luke Bucci), survey experts (Drs. On Amir and Michael Becker), marketing and damages (Dr. Olivier Toubia), and a legal ethicist (Edward McIntyre).

## V.     CLASS CERTIFICATION AND NOTICE OF PENDENCY

27.     On December 10, 2018, Plaintiffs filed their motion for class certification. (ECF Nos. 84-87). Class certification was strongly contested, involving 136 exhibits, declarations from retained experts and Defendant's fact witnesses, a motion to strike evidence, and supplemental submissions. (ECF Nos. 84-87, 89-90, 93-94, 96, 109). Following briefing and oral argument, each party submitted two supplemental briefs. Plaintiffs sought certification of a California class for claims under California Business & Professions Code § 17200, *et seq.* (the "UCL") and Cal. Civ. Code § 1750, *et seq.* (the "CLRA"), a California "senior class" for claims under the CLRA, and a New York class for claims under sections 349 and 350 of the GBL. On June 5, 2019, the Court granted in part

BLOOD HURST & O' REARDON, LLP

and denied in part the motion for class certification. The Court granted certification of the claims asserted by the California and New York classes, but denied certification of the California senior class claim. (ECF No. 110).

28.     Class certification was also obtained in the related *Carrigan* action. The motion was fully briefed and included competing sur-replies. Defendant also moved to exclude the opinions and expert report of one of plaintiff's experts. On October 27, 2020, the Hon. Charles R. Norgle granted plaintiff's motion for class certification, appointed Class Counsel here as class counsel in *Carrigan*, and certified a class of all persons who purchased MFA in Illinois for claims under section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, et seq. (the "ICFA"). *See Carrigan v. Reckitt Benckiser, LLC*, No. 1:18-cv-07073, 2020 U.S. Dist. LEXIS 201083 (N.D. Ill. Oct. 27, 2020).

29.     On February 14, 2020, Plaintiffs filed a motion for approval of a class notice plan to notify the *Yamagata* class of the pendency of the action. (ECF No. 150). In connection with the notice of pendency, Plaintiffs retained a class notice administrator. The Court granted Plaintiffs' motion and the notice of pendency was disseminated. (ECF No. 165).

## VI.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

30.     On September 26, 2019, Defendant moved for summary judgment. Defendant argued Plaintiffs' claims were all preempted by the federal Food, Drug and Cosmetics Act ("FDCA"), that Plaintiffs could not prove MFA advertising was false, and that Plaintiffs' full refund theory fails because MFA is not completely worthless as a matter of law. (ECF No. 116).

31.     In support of its motion, Defendant submitted voluminous exhibits and declarations from two outside science experts. Plaintiffs opposed the motion by submitting declarations from three retained experts who evaluated the scientific evidence concerning MFA and its ingredients. (ECF No. 119). Plaintiffs also moved to exclude the opinions and testimony from both of Defendant's experts. (ECF Nos. 120-121). In turn, Defendant moved to exclude the opinions and testimony from one of Plaintiffs' experts. (ECF No. 132). These respective motions to exclude were themselves accompanied by additional expert declarations. (ECF Nos. 132-1, 139-6, 140-1, 140-2). Evidentiary objections and responses were filed, and Plaintiffs opposed motions to seal certain

evidence. (ECF Nos. 131, 137, 143). On December 12, 2019, the Court held oral argument, and on January 7, 2020, supplemental briefing was ordered. (ECF No. 144). The Parties responded to the supplemental briefing order, submitted supplemental authority, and opposed each other's submissions. (ECF Nos. 147-149). On March 3, 2020, the Court denied Defendant's motion for summary judgment in its entirety. (ECF No. 164).

32.     Defendant petitioned the Court for an order certifying for an immediate interlocutory appeal on the preemption issues. (ECF No. 172). Plaintiffs opposed the motion. (ECF Nos. 173). On May 18, 2020, the Court denied Defendant's motion. (ECF No. 176).

## VII.   EXTENSIVE SETTLEMENT NEGOTIATIONS

33.     The Settlement is the product of extensive negotiations by well-informed Parties. Throughout the course of this Action, before and after class certification and while engaging in substantial discovery and motion practice, there were numerous formal and informal attempts to reach a settlement. These attempts included use of three separate mediators, seven formal mediation sessions, numerous informal settlement meetings between the Parties, and continued negotiations over the last month about every aspect of the Settlement and its exhibits even after a memorandum of understanding was reached. The Settlement is the result of serious and non-collusive negotiations by experienced counsel, who believe it constitutes a fair, reasonable, and adequate resolution.

34.     The first formal settlement negotiation occurred on May 2, 2018. This mediation took place before class certification was briefed. After submitting mediation briefs, I traveled to Chicago at Defendant's where the Parties participated in a mediation session with the Honorable Wayne R. Anderson (Ret.) of JAMS. No settlement was reached.

35.     On April 17, 2019, at the Parties' requested the case be assigned to Magistrate Judge Jacqueline Corley for a settlement conference. (ECF No. 104). The settlement conference occurred on May 22, 2019, in San Francisco. (ECF No. 108). This mediation took place after full briefing on Plaintiffs' motion for class certification, including the exchange of science expert declarations, but before a ruling was issued. No settlement was reached.

36.     The Parties next participated in five full-day mediation sessions with Robert A. Meyer, Esq. of JAMS. These mediations took place on August 25, 2020, September 1, 2020,

BLOOD HURST & O' REARDON, LLP

September 4, 2020, September 16, 2020, and January 5, 2021. The mediations with Mr. Meyer took place before and after class certification was obtained in *Carrigan*, before and after the completion of fact discovery, before and after Rule 26 expert reports and rebuttal reports were exchanged, and during trial preparation. In between formal mediation sessions, Mr. Meyer hosted numerous informal settlement conferences, some with Plaintiffs' Counsel only and others with both Parties present. In connection with the mediation sessions, the Parties exchanged numerous briefs and discrete-issue evidence analyses. Although a settlement was reached with Mr. Meyer during the last formal mediation session, his assistance provided a framework for the Parties to continue meaningful settlement discussions. These lengthy and complex discussions first occurred over telephone and electronic mail. The Parties then met in-person for three days of settlement meetings on January 25, 26, and 27, 2021. Following these negotiations, on the night of January 27, 2021, the Parties agreed to a settlement and executed a term sheet. Over the last month, the Parties have continued to negotiate every aspect of the Settlement agreement, its exhibits, and the class notice plan.

37.     On March 25, 2021, the Court heard oral argument and denied the Parties' prior motion for preliminary approval. ECF No. 214. Immediately following the hearing, the Parties engaged in additional settlement negotiations. Those negotiations eventually led to the all-cash Settlement that is memorialized in this Settlement Agreement. The Parties also continued to entertain bids from settlement administrators and further negotiate prices with them, and continued working with all the various Subpoenaed Retailers to obtain Class Member contact information, and thereafter with the chosen Settlement Administrator to have the millions of Class Member records organized so class notice can be efficiently and effectively be provided to the Settlement Class.

## VIII.   CLASS COUNSEL'S EXPERIENCE

38.     The Court previously found that my partner, Thomas J. O'Reardon II, and I were adequate to represent two single-state classes against Defendant. (ECF No. 110). As part of this Settlement, the Parties now ask the Court to reaffirm our appointment as Class Counsel for the Settlement Class.

BLOOD HURST & O' REARDON, LLP

39.     My law firm specializes in the nationwide prosecution of complex class actions. As indicated in my firm's resume, attached as **Exhibit C** to this Declaration, BHO and its attorneys, including myself and Mr. O'Reardon, have years of experience litigating class actions alleging false and deceptive advertising of consumer products, including dietary supplements. BHO has been appointed lead counsel by numerous state and federal courts, including in complex and multi-district litigation involving false advertising claims brought on behalf of consumers. Since 2010, some of the false advertising class actions in which BHO was appointed Class Counsel include: *Sonner v. Schwabe North America, Inc.* (C.D. Cal.) (false advertising of Ginkgold memory supplement); *Rikos v. P&G* (S.D. Ohio) (false advertising of Align probiotic supplement); *Mullins v. Premier Nutrition Corp.* (N.D. Cal.) (false advertising of glucosamine and chondroitin supplement); *In re Hydroxycut Mktg. & Sales Practices Litig.* (S.D. Cal.) (false advertising of Hydroxycut weight loss supplement); *Rosales v. FitFlop USA, LLC* (S.D. Cal.) (false advertising of toning footwear); *Johnson v. General Mills, Inc.* (C.D. Cal.) (false advertising of General Mills' YoPlus probiotic); *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.) (false advertising of Skechers' toning shoe products); *In re Reebok EasyTone Litig.* (D. Mass.) (false advertising of Reebok's EasyTone footwear and apparel products); *Johns v. Bayer Corp.* (S.D. Cal.) (false advertising of Bayer's One-A-Day men's vitamins); *Godec v. Bayer Corp.* (N.D. Ohio) (false advertising of Bayer's One-A-Day men's vitamins); *Fitzpatrick v. General Mills, Inc.* (S.D. Fla.) (false advertising of General Mills' YoPlus probiotic); *Nelson v. Mead Johnson Nutrition Co.* (S.D. Fla.) (false and deceptive advertising of health benefits of baby formula products); and *Gemelas v. The Dannon Co., Inc.* (N.D. Ohio) (false advertising of Dannon's Activia and DanActive probiotic products).

40.     My firm has also tried, either as assisting counsel or co-counsel, class actions and I am responsible for a number of appeals resulting in consumer protection decisions relevant to this case. *See, e.g., Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468 (7th Cir. 2020) (consumer law and false advertising); *Kroessler v. CVS Health Corp.*, 977 F.3d 803 (9th Cir. 2020) (consumer law and false advertising); *Rikos v. The Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) (consumer law and false advertising), *cert. denied*, 2016 U.S. LEXIS 2244 (U.S. Mar. 28, 2016); *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878 (9th Cir. 2013) (consumer and banking law), *Fitzpatrick v. General*

BLOOD HURST & O' REARDON, LLP

1    *Mills, Inc.*, 635 F.3d 1279 (11th Cir. 2011), *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 320 (2011)

2    (consumer law and false advertising), *McKell v. Wash. Mutual, Inc.*, 142 Cal. App. 4th 1457 (2006),

3    *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49 (2d Cir. 2004) (consumer and banking

4    law), *Lebrilla v. Farmers Group, Inc.*, 119 Cal. App. 4th 1070 (2004), *Moore v. Liberty Nat'l Life

5    Ins. Co.*, 365 F.3d 408 (5th Cir. 2004) (life insurance, consumer protection and civil rights), and

6    *Lavie v. Procter & Gamble, Co.*, 105 Cal. App. 4th 496 (2003). I am a frequent lecturer at seminars

7    about class actions, consumer protection, and related issues.

8    **IX.    THE SETTLEMENT**

9        **A.    The Settlement Class**

10       41.    The proposed Settlement Class is defined as:

11         All persons who purchased within the United States and its territories Move Free
     Advanced, Move Free Advanced Plus MSM, or Move Free Advanced Plus MSM &
12         Vitamin D, other than solely for purposes of resale, from May 28, 2015 to the date
     of the Preliminary Approval Order.
13

14       Excluded from the Settlement Class are: (i) jurists and mediators who are or have presided

15   over the Action, Plaintiffs' Counsel and Defendant's Counsel, their employees, legal

16   representatives, heirs, successors, assigns, or any members of their immediate family; (ii) any

17   government entity; (iii) Reckitt Benckiser and any entity in which Reckitt Benckiser has a

18   controlling interest, any of its subsidiaries, parents, affiliates, and officers, directors, employees,

19   legal representatives, heirs, successors, or assigns, or any members of their immediate family; and

20   (iv) any persons who timely opt-out of the Settlement Class.

21       **B.    Settlement Relief**

22         **1.    Direct Benefits to Class Members**

23       42.    Pursuant to the Settlement, Defendant will create a $50 million, non-reversionary

24   Common Fund to compensate Class Members, pay for Class Notice, and any award of attorneys'

25   fees, expenses, and Class Representative service awards.

26       43.    Class Members will receive $22 cash for each unit of MFA they purchased. This

27   reimbursement amount is the average retail price paid by Class Members and so a full refund, the

28

BLOOD HURST & O' REARDON, LLP

monetary relief sought in this action. Based on data provided in discovery, which was analyzed by the parties' experts, the average retail price for MFA during the class period is about $22.

44.     For Class Members with proof of purchase, they can receive reimbursement for all MFA purchases. For Class Members with no proof of purchase, they may receive reimbursement for up to three purchases, which is a number that exceeds the average number of MFA purchases by Class Members. Based on data provided in discovery, which data was analyzed by the parties' experts, the average number of MFA units purchased per Class Member during the class period is about 2.6.

45.     Depending on the amount of money left in the non-reversionary Common Fund, Class Members may receive up to three times their valid claim amount. Therefore, Class Members may receive up to $66 cash. For Class Members who do not submit proof of purchase, but who submit a claim for three units purchased, the total potential award is $198 cash.

46.     To be eligible for reimbursement, Class Members need only complete and timely submit a simple Claim Form, either on the Settlement Website or by mail to the Settlement Administrator.

47.     The Settlement Administrator will decide whether the submitted claim forms are complete and timely. Class Members are given an opportunity to correct any incomplete claim forms or to appeal the Settlement Administrator's rejection of any claim. The Settlement Administrator will fulfill all valid claims by sending cash to the Class Member. Claimants can choose to receive the Cash Payment via a physical check or digital payment such as digital MasterCard, Venmo, Amazon, or eCheck. Digital payment is very convenient for Class Members and is also less expensive than issuing checks, thereby reducing transaction costs against the Common Fund.

48.     No portion of the Common Fund will revert to Defendant. Any funds remaining after calculating valid claims will be distributed to Claimants by increasing the amount of their valid cash up to three times the original claim amount. In the event such increased amount would exceed three times the original claim amount, a second round of class notice and an additional claim-in opportunity will be provided to the Settlement Class. If money remains after this Supplemental Claim Deadline, the valid claims will be increased by up to three times the original claim amount.

BLOOD HURST & O' REARDON, LLP

49.     Any money that remains, including as a result of uncashed checks, will be distributed *cy pres* to the non-profit Orthopaedic Research Society ("ORS"). Given the large size of the cash awards, the combined Direct Notice and Publication Notice process, the second Direct Notice and Supplemental Claim process, and three-time upward adjustment provision, the Parties anticipate only a small amount of remaining funds. Notwithstanding, I believe ORS is an appropriate *cy pres* recipient in this Action. As explained in the concurrently submitted Declaration of Brenda Frederick Re: Orthopaedic Research Society, the ORS mission is to advance education and research of musculoskeletal conditions, specifically including osteoarthritis. There is a direct nexus between ORS and the interests of Class Members and this litigation because Plaintiffs allege MFA was advertised as a treatment for the symptoms of osteoarthritis.

### 2.     Notice and Administration Costs, Attorneys' Fees and Expenses, and Class Representative Service Awards

50.     Notice and administration expenses, attorneys' fees and expenses and the Class Representative service awards will be paid from the Common Fund.

51.     In the fee motion to be submitted in connection with final approval, Class Counsel will request 25% of the Common Fund, or $12,500,000, as attorneys' fees plus reimbursement of costs.

52.     The Parties did not negotiate attorneys' fees, costs, and expenses until after they had reached an agreement on the relief for Class Members.

53.     To date, Plaintiffs' Counsel's lodestar is $5,364,076.60. Plaintiffs' Counsel will incur additional lodestar and expenses in implementing the Settlement, working with the Settlement Administrator and the subpoenaed third-party retailers, and seeing the Settlement through final approval. Under the Settlement, Defendant will not oppose Plaintiffs' Counsel request for reimbursement of expenses of up to $750,000. Although Plaintiffs' Counsel have not yet received all invoices for costs incurred, they anticipate their expenses will be within that amount. As will be further detailed in the motion for attorneys' fees and expenses, these expenses were reasonably and necessarily incurred for filing and court fees, legal research, travel, postage, printing, experts and consultants, mediations, disseminating the notice of pendency, depositions, and trial preparation.

BLOOD HURST & O' REARDON, LLP

00176244

54.     Defendant also agrees not to oppose a request for Court-awarded service awards of up to $7,500 to Plaintiffs Yamagata, Pelardis, and Carrigan, and up to $500 to Plaintiffs Coletti, Maher, Marshall, Rawls, Steele, and Tishman. Plaintiffs' agreement to the Settlement is not conditioned in any manner on the award of a service award or its amount. Plaintiffs have agreed to a broader release of claims than the release applicable to the absent Class Members.

55.     Each plaintiff stepped forward and volunteered to represent the Class Members. Each devoted time, effort, and resources on behalf of the Class. Defendant conducted substantial discovery of Plaintiffs Yamagata, Pelardis, and Carrigan. It served 44 interrogatories, 170 requests for admissions, and 70 document requests. As a result, Plaintiffs Yamagata, Pelardis, and Carrigan searched for and produced documents and other information concerning the actions of the plaintiffs and their contentions. Plaintiffs Yamagata, Pelardis, and Carrigan also were deposed, devoted time and effort providing information to assist in the litigation, participated in periodic telephone conferences, and reviewed and approved pleadings, including complaints and the Settlement. Plaintiffs Lori Coletti, Ann-Marie Maher, Carol Marshall, Deborah A. Rawls, Oneita Steele, and Maxine Tishman also devoted time and effort to assist in the litigation. Each reached out to and were interviewed by counsel, volunteered to serve as named plaintiffs and proposed class representatives, and reviewed and approved the complaints in which they are named. They were prepared to file a class action complaint on behalf of purchasers of states other than those covered by *Yamagata* and *Carrigan*, but the parties reached an agreement to toll their claims and those of the proposed multistate class and refrain from filing the complaint while the parties discussed settlement.

### 3.     The Class Notice Program

56.     I have extensive experience working with class action administrators. Based on this experienced, I developed a list of administrators that I believed could handle a settlement of this size and develop a very good class notice and class member outreach program to ensure Class Members had an opportunity to participate in the Settlement and that the Common Fund would be fully spent. From this list, the Parties sought competitive bids from four settlement administrators before selecting of Epiq Class Action and Claims Solutions ("Epiq"), a claims administrator with

significant expertise and experience. Even after selecting Epiq, we continued to negotiate in order to reduce costs and to further refine the bid and Class Notice Program and claims administration process to reflect information as it was obtained from retailers.

57.    The Parties have developed the Class Notice Program with the assistance of Epiq. The concurrently submitted Declaration of Cameron R. Azari Regarding Class Notice Program ("Azari Declaration") describes in detail the various components of the proposed program.

58.    Based on my knowledge and experience in similar class action litigation, I believe the Class Notice Program here constitutes the best notice practicable under the circumstances of this case. It informs Class Members of their rights through a comprehensive, multi-faceted plan for delivery of notice by email, U.S. mail, a settlement website, and targeted Internet media.

59.    We also have issued subpoenas to the primary retailers of MFA: Costco Wholesale Corporation, Walmart Inc., Walgreen Co., Rite Aid Corporation, CVS Pharmacy, Inc., BJ's Wholesale Club, Inc. and Amazon.com, Inc. (the "Subpoenaed Retailers"). These Subpoenaed Retailers are responsible for approximately 90% of the sales made to Class Members. Over the last several months, following Class Counsel's negotiations with each of the Subpoenaed Retailers, they each gathered their individually identifiable contact information for Class Members and have now all provided that information to the Settlement Administrator. The Azari Declaration explains in detail how this retailer data will be utilized for sending direct Email Notice and Postcard Notice.

60.    We pursued Class Member contact information from every retailer of MFA that is a club membership store (Costco, Sam's Club, and BJ's Wholesale), which maintain detailed sales records, and the largest online-only retailer of MFA, Amazon. Sales through Costco account for about half of the total MFA sold to Class Members, and by a wide margin is the top selling retailer of MFA. In addition to the club memberships stores, we pursued Class Member contact information from each major retailer of MFA. While these retailers do not have purchase information for all people who bought MFA, they have a significant amount of information. Following negotiations over production in compliance with the subpoenas, Walmart, Walgreens, CVS and Rite Aid have produced MFA purchaser contact information obtained through their loyalty programs and online sales to the proposed Settlement Administrator. The Settlement Administrator has eliminated

BLOOD HURST & O' REARDON, LLP

duplicate entries and otherwise cleaned up the data. It also had the data "reverse appended" to obtain email addresses in those instances where email addresses were missing. As a result of all of these efforts, I am informed by the Settlement Administrator there is direct contact information for 4,668,612 Class Members, representing 76% of the total estimated Settlement Class.

61.     Amazon has proposed to email class notice directly to its customers. We have met and conferred with Amazon about this and are satisfied it will adequately provide its customers with notice. It regularly distributes class notices to its customers and believes it provides the best option for doing so while protecting its customers' privacy and reducing customer confusion and dissatisfaction. As noted in the proposed order granting preliminary approval, the Parties request and Amazon has agreed that it be ordered to send the email notice within forty-five (45) days of the Preliminary Approval Order. Within seven (7) after sending the email notice, Amazon will provide a declaration to Class Counsel and Defendant's Counsel confirming compliance with the Preliminary Approval Order and stating the total number of Class Members to whom it successfully sent email notice as reported by Amazon's email server.

62.     Several courts have approved of Amazon sending similar direct email notices to its customers, including in the following cases:

    a.   Order Approving Class Notice to Amazon.com Customers, *In re ARRIS Cable Modem Litigation*, No. 5:17-cv-01834-LHK (N.D. Cal. Feb. 13, 2019), ECF No. 168;

    b.   Order Granting Stipulation to Modify Order Directing Notice to the Class, *Park v. ZUFFA LLC*, No. 2:17-cv-02282-APG-VCF (D. Nev. April 4, 2018), ECF No. 76;

    c.   Declaration of Steven Weisbrot, Esq. of Angeion Group, LLC Re: Implementation of Notice Program, *In re Lenovo Adware Litigation,* No. 5:15-md-02624-HSG (N.D. Cal. Feb. 14, 2019), ECF 248-1 at Ex. D;

    d.   Declaration of Tammy Malley-Naslund, *Wolf v. Hewlett-Packard,* No. 5:15-cv-01221-TJH (C.D. Cal. Sept. 4, 2018), ECF 136-8;

    e.   Order Approving Class Notice to Amazon Customers, *In Re Nexus 6P Prods.*

BLOOD HURST & O' REARDON, LLP

00176244

*Liab. Litig.*, No. 5:17-cv-02185-BLF HSG (N.D. Cal. Jun. 04, 2019), ECF No. 212;

    f.    Order Approving Class Notice to Amazon, Inc. Customers, *Shin v. Plantronics, Inc.*, No.5:18-cv-05626-NC (N.D. Cal. Oct. 31, 2019), ECF No. 83.

63.    Amazon reports that its past direct notice efforts have been very successful, resulting in a high percentage of emails being successfully delivered and a low percentage of emails bouncing back, which it attributes to its ongoing business relationship with its customers.

64.    Following numerous meet and confer efforts and in response to the Court's comments and questions made during the previous hearing on preliminary approval, Amazon has now agreed to send an email notice that contains the same elements as the Email Notice being sent to the other Class Members. *See* SA, Exs. 6 (Email Notice) and 7 (Amazon Email Notice). Like the Email Notice, the Amazon Email Notice uses language and incorporates the substantive elements from the Federal Judicial Center's model summary notice.

### 4. The Release

65.    Under the Settlement, each member of the Settlement Class will be deemed to have released with the exception of claims for personal injury, all claims that were or could have been asserted in the Action and that are based on the identical factual predicate of those claims in the Action, specifically that Move Free Advanced was misleadingly marketed, promoted or sold, specifically including all elements of the labelling packaging, advertisements, promotions and marketing of Move Free Advanced, including the language, presence, or absence of any disclaimers. Class Members are releasing claims based only on the identical factual predicate set forth in the Second Amended Complaint. The named Plaintiffs have agreed to a broader general release.

## X. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

66.    Based on my experience, the settlement consideration, and my assessment of the risks of further litigation, I believe the Settlement meets the fair, reasonable, and adequate standard and should be approved. Both the Common Fund amount of $50,000,000 and the individual awards of full retail price refunds represent a significant recovery of the possible damages that Plaintiffs might recover assuming success on all claims on a representative basis. The result is well within the

BLOOD HURST & O' REARDON, LLP

reasonable standard when considering the difficulty and risks presented by pursuing further litigation.

### A.    The Strengths of Plaintiffs' Case and Inherent Risks of Continued Litigation Weigh in Favor of Preliminary Approval

67.    If litigation were to proceed, Plaintiffs would face substantial hurdles in obtaining and keeping a successful verdict, and any upside would be limited by the claims and remedies. Federal courts continue to develop procedural hurdles that prevent or limit determination of cases on the merits or to provide full relief to injured plaintiffs. These developments are often unexpected and often reflect changes to previously well-established law. The effect of these developments falls disproportionately on class actions, which are more procedure-bound than most other types of cases. *See, e.g.*, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) (novel application of *Erie* Doctrine to plaintiffs seeking equitable relief in federal court).

68.    Here, Defendant maintains a host of procedural and substantive arguments. It asserts Plaintiffs have suffered no injury because at least one active ingredient in MFA provides the promised joint health benefits. Defendant retained four scientific experts and has four other highly-credentialled fact witnesses to explain why MFA works. Defendants offered Dr. Daniel Grande, who analyzed clinical and pre-clinical evidence, and Dr. Martin Lotz, an experienced osteoarthritis researcher whose laboratory regularly conducts NIH-funded research into compounds for maintaining joint health such as glucosamine. While Plaintiffs believe the totality of the evidence demonstrates the inefficacy of MFA and its ingredients, the sheer volume and complexity of the science at issue and the high placebo rate associated with joint pain supplements that lead consumers to think they work injects substantial risk into the litigation. Defendant also argues MFA provides other benefits in arguing that full refunds are not appropriate. Even if Plaintiffs prevail at trial, Defendant likely would appeal, creating further uncertainty.

69.    Given the uncertainties balanced against this landmark settlement, this factor favors preliminary approval.

BLOOD HURST & O' REARDON, LLP

00176244

**B.      The Risk, Complexity, Expense, and Duration of the Litigation**

70.      The Settlement provides substantial benefits to Class Members – to my knowledge, more than any other case of its kind. The guaranteed recovery obviates the risk and delay of continued litigation, trial, and appeal, which are significant factors considered in evaluating a settlement. Any continued litigation is time-consuming and expensive and may not obtain any more than is immediately available through the Settlement. These uncertainties are made worse by the pandemic. The elimination of delay and expense weighs in favor of approval.

**C.      The Settlement Provides Significant Relief**

71.      To my knowledge, the Settlement is the largest in a dietary supplement false advertising action. The $50 million Common Fund allows for full refunds for the Settlement Class that is commensurate with the amount an individual Class Member would receive after a successful trial. The $22 Cash Payments represents the average retail price paid by Class Members.

72.      Each Class Member may receive reimbursement for up to 3 purchases without proof of purchase, which is slightly higher than the 2.6 average number of purchases. Class Members are also entitled to reimbursement for all qualifying purchases where proof of purchase is presented. The Claim Form is simple and straightforward, requiring only entering the number of products purchased, selecting if you want to receive a check or digital payment and clicking submit. That is all. *See* Settlement Agreement, Exhibit 10. In the case of Class Members accessing the Claim Form by clicking the link in the Email Notice, even their names and addresses can be pre-populated on the Claim Form by entering the unique ID from their email. *See* SA, Ex. 10. The Settlement Website makes it easy to submit a Claim Form.

73.      If the Common Fund is not fully depleted, claimants will receive pro rata increases in compensation.

74.      Meanwhile, the Release is appropriately narrow. Class Members only release claims based on the identical factual predicate, as required under Ninth Circuit precedent. Likewise, there are no differences between the claims to be released and the claims alleged in the operative complaint.

BLOOD HURST & O' REARDON, LLP

75.   Finally, this Settlement compares favorably to MFA's overall sales and other settlements in this area. Class Members purchased approximately 16,050,065 units of MFA nationwide during the Class Period for about $358,879,453.

76.   This Settlement represents the largest or among the largest recovery in a false advertising action involving a retail product. The largest previous settlements are (or include) *In re Skechers Toning Shoes Prods. Liab. Litig.* (W.D. Ky.) ($40 million settlement) and *Gemelas v. Dannon Co., Inc.* (N.D. Ohio) ($45 million settlement). I was Class Counsel in *Skechers* and *Dannon*. These settlements are substantially larger than other settlements in this area.

77.   The proposed settlement is far better than a previous settlement of a very similar Move Free Advanced false advertising class action. In *Lerma v. Schiff Nutrition Int'l, Inc.*, No. 11cv1056-MDD (S.D. Cal. Nov. 3, 2015) a federal court granted final approval of a $6.51 million class action settlement that encompassed MFA and numerous other products sold by defendant. Despite the amount of the settlement, the *Lerma* settlement class was many times larger than the proposed Settlement Class here. Further, class members in *Lerma* were limited to recovering $3 per unit purchased for up to 4 units purchased. Even with proof of purchase, class members only received $10 per unit purchased for up to 5 units purchased. *Lerma*, ECF No. 171.

78.   The proposed Settlement also is far better than other glucosamine joint health supplement false advertising actions. On August 25, 2016, the court in *Pearson v. Rexall Sundown, Inc.*, No. 1:11-cv-07972 (N.D. Ill.) (ECF Nos. 288, 344), a class action involving the number one selling, billion-dollar glucosamine product Osteo Bi-Flex, approved a $9 million settlement providing $8 payments to class members that was later reduced pro rata to $2.18. Similarly, in *Hazlin v. Botanical Labs., Inc.*, No. 13cv0618-KC, 2015 U.S. Dist. LEXIS 189687 (S.D. Cal. May 20, 2015), the court granted final approval of $3.1 million settlement involving Wellesse Joint Movement Glucosamine products. *See also Gallucci v. Boiron, Inc.*, No. 11cv2039, 2012 U.S. Dist. LEXIS 157039, at *2, 7 (S.D. Cal. Oct. 31, 2012) ($5 million settlement in case involving falsely advertised homeopathic products with retail sales of $65,575,194); *In re Cobra Sexual Energy Sales Practices Litigation,* No. 2:13-cv-05942 (C.D. Cal.) (final approval granted on April 7, 2021, of

BLOOD HURST & O' REARDON, LLP

00176244

1   $100,000 common fund with attorneys' fees of $490,000 in false advertising case involving men's

2   virality supplement).

3     **D.**   **The Extent of Discovery and Stage of Proceedings**

4     79.   The Settlement was reached shortly before the final pre-trial conference. Fact

5   discovery was closed, opening and rebuttal expert reports were exchanged, and expert depositions

6   were nearly complete in *Yamagata*. The cases were thoroughly litigated. *See* §§ II-VI, above. As a

7   result, I was able to make reasoned and informed settlement decisions.

8     80.   Moreover, the Settlement was negotiated over the course of numerous mediation

9   sessions spanning the length of the litigation with experienced mediators. The Settlement was

10  heavily negotiated and was always at arms' length.

11    **E.**   **The Experience and Views of Counsel**

12    81.   As discussed above, we have substantial experience serving as class counsel in

13  consumer protection class actions. I believe this record-setting Settlement is fair, reasonable, and

14  adequate and should be approved.

15    I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct. Executed on May 12, 2021, at San Diego, California.

17

18        By:     *s/ Timothy G. Blood*

19           TMOTHY G. BLOOD

20

21

22

23

24

25

26

27

28

00176244

DECLARATION OF TIMOTHY G. BLOOD ISO MOTION FOR PRELIMINARY APPROVAL

BLOOD HURST & O' REARDON, LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for defendant Reckitt Benckiser LLC to the e-mail addresses denoted on the Electronic Mail Notice List, and that I have mailed the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 12, 2021.

*s/ Timothy G. Blood*

TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

BLOOD HURST & O' REARDON, LLP

00176244